Case number 14-5771, Penny Ross v. Fluid Routing Solutions. For argument not to exceed 15 minutes per side, Ms. Teresa Ann Luna for the appellant. Good morning, your honors. I'm Teresa Luna. I'm here for the appellant, Penny Ross. I'd like to reserve five minutes of rebuttal time, please. Penny Ross was a 24-year employee at Fluid Routing Solutions. She rose up from being... Is there a microphone up there? I don't see one, your honor. I just said, is there a microphone or something up there? If not, can you just keep your voice low? I will. I'll speak loudly. I used to be a school teacher, so I can do that. That should do it. Penny Ross is a 24-year employee at Fluid Routing Solutions. She rose up from being a factory worker all the way up to being an HR manager, and she was an HR manager for seven years before her termination. She got great reviews, performance evaluations, bonuses, promotions, until Tim Paris became the plant manager in 2009. At that point, he began discriminating against women, African Americans, those with workers' comp claims, people with disabilities. She began complaining to him and opposing what he was doing. And interspersed with those complaints and those oppositions, there began to be negative performance reviews, increased scrutiny, and the like. Finally, after all those oppositions, he terminated her from her employment in 2012. At that point, he replaced her with a male who made $11,000 more per year than she made, doing the exact same job. In Ms. Ross's gender discrimination claim, the court found that there were no similarly situated male employees. We would respectfully say that this is not true. FRS itself, in a document that we presented to the court, listed Ms. Ross's comparables, and it was for the purpose of, before Tim Paris arrived, in bringing Ms. Ross up to the level of the comparable male employees. They were all in grade 19, and the plant manager himself testified that the only difference in their salaries should have been in experience, and Ms. Ross had more experience than they had. There were several men and two women in grade 19. All the men made more than all of the women. Another mistake that the district court made... Were the jobs all comparable? I'm sorry, Your Honor? Was the work all comparable? You've talked about the salaries, but that's not the real issue, is it? Well, Your Honor, Ms. Ross held a unique position as the HR manager. She was the only person that held that position. In Ursugowitz v. Goodyear Tire, this court instructs us that we can't apply it that narrowly when it removes that person in a unique position from the protection of Title VII or the Tennessee Human Rights Act. And that's effectively what happened here. There is no other human resource manager. But you were comparing her with other people in the plant, not with the person replacing her. And I said, Are those comparable? Your Honor, we would say yes, and the reason is because Tim Paris himself said that there were a group of managers who were directly below him. They were all in pay grade 19, and they all reported to him. They may have had... Were they doing a comparable job? That's what I'm saying. One could be digging ditches, and the other could be jumping off buildings. I mean, you wouldn't say they're comparative. But they both may make the same amount of money. I see your point. Comparable in the level of the job that they were doing, the importance of the job that they were doing, but different positions. But in looking at it that way, it leaves Ms. Ross without any kind of protection under the Tennessee Human Rights Act. Some jobs are unique. Some jobs are unique. And Ursugowitz v. Goodyear Tire instructs us that when they are unique, that you must stretch the rule out a little bit more and not apply it that narrowly. Another mistake that we feel the court made in the gender discrimination claim was to look at each of these adverse employment actions in isolation. We're instructed by the Sixth Circuit in Thurman v. Yellow Freight to look at these like a whole play, not like as separate scenes. In prong four of her gender discrimination claim, she's able to show that similarly situated males were treated better than she was, and she's also able to show that a male replaced her. And in looking at the male that replaced her, the court found that they weren't similarly situated, even though Randy Good came in and replaced her as the HR manager, making $11,000 more per year than she made. FRS's argument here is that Randy Good was doing a different job, but there's been an abundance of evidence showing that they both did the same job. They both were HR managers at the Lexington plant and served in that capacity in some respects at other plants as well. Perhaps the most interesting thing about the court's ruling and what we feel like is probably the biggest error is in looking at the pretext determination. In looking at the pretext, the court was not real clear whether she had shown pretext or not, although it said even if she's able to show, even though she shows some evidence to rebut their nondiscriminatory reason, Ms. Ross still cannot overcome the fact that they might have had an honest belief. And that brings the honest belief rule into the argument here. Respectfully, we would say that what the court did was to apply the bare honest belief rule, which is not this circuit's rule. This circuit has a modified honest belief rule, which requires an investigation and reliance upon particularized facts. None of that was shown here. In fact, FRS never mentioned honest belief, never showed an investigation, never showed which facts it relied upon at all. This court has instructed us that it's the employer who has to make a strong showing and that this court cannot make a blind assumption that probably the employer had an honest belief about it. That's not the way the honest belief rule works here. The question is, was there enough evidence to get to a jury? I guess probably the most controversial thing we put in our brief was that the honest belief rule as applied by the district court violated what Reeves v. Sanderson said about Pretext Plus and then later what this court said in Griffin v. Finkbinder, that you can't look at the honest belief rule and say that it is an additional step beyond Pretext. Because in both Reeves and Finkbinder, evidence that the employer's reason was not the actual reason is enough. You show a prima facie case, you show enough evidence to rebut the defendant's explanation, and you should get to a jury trial. That's enough to get to a jury trial. Respectfully, when you read the cases on honest belief rule, you come back a little confused as to whether is the honest belief determination a part of the pretext or is it afterward. We would say that it needs to be a part because otherwise it violates the rule set down in the Supreme Court decision in Reeves v. Sanderson. In Ms. Ross's retaliation claim, she put forth a chain of events. This is a situation where it wasn't like one event caused her termination. This happened over a period of about three years. In fact, Mr. Parris himself, when he testified, said it wasn't just one thing. It was a chain of events. In his explanation, he pointed us back to the 2010 and the 2011 negative performance reviews. He said, that's why I terminated her. You can see the reasons in there. That makes you see that the plant manager, the terminator himself, said that it was a chain of events that happened over a particular time. The district court rejected our chain of events cases that we presented and looking at it that way and did not find any kind of temporal proximity and found that there was no causation for the retaliation claim. Counsel, after this new manager came in, your client started getting negative or less than complimentary. There might be a better way to put it. Performance reviews. Why are we to doubt the accuracy or the fairness of those reviews as a basis for the termination, even though she might have done well under the prior management? I see your question as she could have started failing afterwards. Or not meeting the expectations of the new management. In our brief, we questioned Mr. Parris about exactly what were the reasons, and we looked at the reasons in the reviews and took each one of those reasons and we presented sufficient evidence to rebut or to completely falsify each one of those reasons in our brief. But if her supervisor had a different impression or standard that he wanted fulfilled, even if he was incorrect, why wouldn't that be a sufficient basis for eventually letting your client go, even if you and your client may have disagreed with this reason? Because she was an at-will employee. So how are we to convert this into a discrimination case? Your Honor, I think that's where the application of the honest belief rule comes in, in that particular situation. If Ms. Ross is able to rebut the reasons, for example, in the safety, one of the reasons was that the safety program was at risk. But the evidence turns out that the safety program was the strongest and that the accident numbers were the lowest under her administration of this program. And so you look at what Tim Parris said about the safety program, that it was failing under her. And you look at the evidence. If he is going to assert, well, I had an honest belief that that was the case, then he must then show that he relied on particularized facts. And there was no showing at all of any investigation or any reliance on particularized facts. All right. Thank you. Good morning, Your Honors. May it please the Court, my name is Chris Anderson. I'm with the National Office of Littler Mendelson, here on behalf of Fluid Routing Solutions. And with me today is Shana Fonsbeck, who is also with our office. The district court decided this correctly. FRS is entitled to summary judgment on plaintiff's retaliation claim and plaintiff's discrimination claim. Plaintiff failed to offer any evidence that she was terminated because of her gender because she simply did not identify any similarly situated males. Beyond that, plaintiff failed to offer any evidence that FRS's decision to terminate her employment, its legitimate non-discriminatory decision, was pretextual. And, Your Honor, if I might direct my comments to your question, you all have hit the nail on the head in two ways. One, Ms. Ross failed to identify any similarly situated males in terms of their job requirements, their skill set, their managerial authority. She identifies three materially adverse actions. One, she was paid less than similarly situated males. Two, she was subject to heightened scrutiny, which resulted in a negative performance review. And three, she was ultimately terminated. Plaintiff fails to offer any evidence that any similarly situated males to her were paid more. She doesn't identify any males who had similar job requirements, similar managerial authority, the same supervisor. So, in essence, the court was left with nothing to compare her to and, as a result, could not find discrimination based on THRA or its correlative title. She does draw a comparison with her successor, doesn't she? She does, Your Honor, and the court did recognize that. But Mr. Goode, who was her successor, is clearly not similarly situated to her for two reasons. One, Mr. Goode is eminently more qualified than Ms. Ross. As our briefs show, Mr. Goode had extensive experience in the human resources area. He had taught several classes, both in the military and during his tenure at various manufacturing facilities. He had been an HR professional in the manufacturing segment of the industry for several, several years, unlike Ms. Ross, who had been, I think, HR manager for less than five. Beyond that, the job had changed considerably. In early 2012, late 2011, FRS decided to expand the role of the HR manager and make it a company-wide human resources manager who was in charge of company-wide recruiting and, of course, human resources management. Ms. Ross was only responsible for the facility in Lexington, Tennessee, which involved about 300 to 350 employees, and she also had some attendant responsibilities for a facility in Ocala, Florida. Mr. Goode, however, would be the company's HR manager, responsible for over 1,300 employees and a direct report to Mike Lazier, who was CEO of the company.  She reported to the plant manager, which at the time was Tim Parris, and reported to corporate HR, but she never reported to the CEO. So Mr. Goode is not similarly situated to Ms. Ross in any way. In terms of pretext— Does that mean that he did not replace her, that actually there was a new job created for him? That's exactly right, Your Honor. There was a new job created for him or with him in mind in late 2011, early 2012. Does that then mean that her termination had nothing to do with the hiring of WAC? They're both in the human resources area, so it's hard to say it didn't have anything to do, but that was a separate decision, separate and apart from the company's decision regarding the disposition of the plaintiff's employment in terms of terminating her. In other words, were the two events, the hiring of Mr. Goode and the termination of Ms. Ross, how were they related or not related? Your Honor, FRS decided to expand the role of the HR position. Tim Parris and Mike Lazier decided that they needed someone who had the requisite experience to take on such an expansive role. Ms. Ross had only been an HR professional or an HR manager at the facility in Lexington and had really no experience as a corporate-wide HR manager. What Mr. Parris determined was that based on his past experience with Ms. Ross, she lacked the requisite skill set and qualification and experience to fulfill this new expanded role. He based that on several things. One, as Appellant mentioned, was Ms. Ross's poor work performance in the safety area, but there were many other areas as well. She demonstrated a lack of organizational skill. She demonstrated a lack of confidence. I think Mr. Parris termed it she lacked the ability to inspire those to follow her. She did not administer FMLA leave particularly well. He was disappointed with the way that she did that. She allowed employees to take more leave than they were allotted and she allowed them to take intermittent leave for what he viewed to be invalid reasons. There were several reasons why Mr. Parris did not think that Ms. Ross lacked or had the requisite experience and skill set to perform this new position. Those reasons are outlined in detail in his February 2011 performance review of Ms. Ross. Of course, he identified those reasons in his deposition. Ms. Luna brought up the safety performance and that's an important point because Ms. Ross deposed several supervisors about the safety record of the plant. The be all end all of the deposition testimony was that the plant is essentially safe. It's not any less safe than what it was before Ms. Luna's tenure and it's not any safer now than what it was during her tenure. That was primarily based on injury numbers and there's no dispute. Injury numbers have not gone down. They've really not gone up. But that wasn't Mr. Parris's reason for deciding that Ms. Ross performed inadequately in the safety area. What Mr. Parris expected her to do was to put together a comprehensive safety program that involved development of training programs, that involved the development of investigation techniques, and he wanted her to improve communication among the safety managers in the plant. Ms. Ross never put forth any evidence of pretext that those weren't objectives that Mr. Parris had. She put forth no evidence that those weren't objectives that were communicated to Ms. Ross. So for her to use pure numbers and to say, well, the plant was safer, that's not adequate evidence of pretext because that doesn't dispel or undermine Mr. Parris's reason for deciding that she lacked experience in the safety area and that she did not perform adequately. As far as retaliation, Your Honor, we believe that Ms. Ross did not engage in a protected activity. She cannot establish a causal link between any alleged protected activity and a materially adverse employment action. And as I mentioned, she cannot establish that FRS's decision to terminate her employment or engage in any materially adverse employment action was pretextual. Ms. Ross did not engage in a protected activity by alerting her employer to potential state and federal violations of employment law. For an employee to engage in a protected activity, they have to step outside the scope of their employment and engage in a blatantly adverse action to their employer, the interests of their employer. Ms. Ross never did that. Ms. Ross, while she may have complained or raised concerns about issues that she thought could expose the company to violations of law, she never stepped outside her employment. She always acted in the company's best interest. What she was attempting to do was to minimize the company's exposure. She never advocated on behalf of employees. She never advised employees of their statutory rights. She never threatened to go to an outside organization and certainly never went to an outside organization such as the EEOC or DOL. So while this Court has decided Johnson v. University of Cincinnati, we think those facts are easily distinguishable. In the University of Cincinnati case, the plaintiff in that case actually advocated on behalf of minorities. He went far beyond the scope of his employment to assert to some extent the statutory rights of those employees. Mr. Johnson in that case actually put pen to paper, wrote a memo expressing his concerns and his worry that the university was not committed to its affirmative action program. And not only did he put pen to paper and write that out, he published that piece to all cabinet members of the president's administration. So in essence, he made that public. He didn't go up his conventional chain of command and send that memo to his immediate supervisors. But he felt it was necessary to exert pressure on the administration to get them to change. To do that, he felt he had to go public. Ms. Ross never engaged in any type of blatantly adverse action such as that. Ms. Ross simply communicated her concerns to her immediate supervisors, which was Mr. Parris, in an effort to minimize the company's exposure to litigation and liability. She always acted in the company's interest in that respect. The situation of Kenneth Hudson, I think, demonstrates or illustrates this point well. You might remember from the briefs that Kenneth Hudson was an African-American employee who was ultimately terminated for falsifying his time records. Essentially, he would clock in, leave the plant, come back, and clock out. Well, Ms. Ross noted her concerns that because he was an African-American and because he had filed a work comp claim, there could be construction violations of state and federal employment law. But in the end, Ms. Ross testified that it was in the best interest of the company to terminate Mr. Hudson. So it's clear that she is acting in the company's interest there. Had she stepped outside the scope of her employment and taken a position adverse to the company, she could have threatened to go to the DOL or the EEOC in that regard. She could have advised Mr. Hudson that he had statutory rights and he should avail himself of those rights. She could have threatened to quit. She could have elevated her concerns even to the CEO of the company. She never did any of those things. So really what she continued to do was her job as an HR manager, alerting her employer of potential violations of state and federal employment law. And as a result, she did not engage in a protected activity. Ms. Ross also fails to establish a causal link between any alleged protected activity and materially adverse employment action. Ms. Ross fails to establish the requisite temporal proximity in all but one of her alleged protected activities. But she tries to go beyond temporal proximity and use what she calls a series of events to establish retaliatory intent on behalf of FRS. In essence, because she lacks temporal proximity, she needs to establish that FRS acted with retaliatory intent nonetheless. This series of events that she refers to really is the fact that Mr. Paris ignored her. It's what it boils down to. That does not rise to the level of blatantly negative treatment that this court has found in the past to establish retaliatory intent. In the case of Little v. BP Exploration, in that case the plaintiff filed an EEOC charge and the employer actually directed other employees to make false accusations against the employer or an employee. And also, that employee was subjected to severe discipline for a run-of-the-mill dress code violation. So it's clear in that case that the employer had the requisite retaliatory intent whether or not the plaintiff could establish temporal proximity between protected activity and the adverse employment action. The other case that we cited in our brief is Moore v. Cook of Welding. Same type of situation. In that case, the plaintiff was subjected to severe isolation by the employer and also was disciplined for offenses that other employees were not disciplined for. In this case, ignoring Ms. Ross simply doesn't rise to the level to indicate or to demonstrate retaliatory intent. And as a result, her lack of temporal proximity is fatal to her retaliation claim. Lastly, Your Honors, I've discussed the pretext argument. Ms. Ross fails to put forth any evidence of pretext, any evidence that the reason, legitimate non-retaliatory reason, provided by FRS is mistaken, trivial, or foolish. So the Honest Belief Rule actually does not apply in this case. And we think the District Court may have jumped the gun a little bit. Because Ms. Ross didn't put forth any evidence of pretext, there's no reason to go into the Honest Belief Rule. And Your Honors, if the Court has no further questions, I'll conclude my argument. Thank you. We do not. Thank you, Counsel. With regard to Mr. Good, Mr. Randy Good, the replacement for Penny Ross and Ms. Ross's comparable attributes, she had been the HR manager there for seven years and had been at that plant for 24 years and had risen up through the ranks. There's no evidence that Mr. Good had corporate-wide HR experience. In fact, he had jumped around from job to job to job and hadn't stayed at any place very long. He'd been terminated from two of his HR positions. He might have been in HR a little longer than Ms. Ross, but not as the manager. Only a few of his positions were manager positions. Also, we would encourage you to look at the offer letter to Mr. Good that Mr. Parris sent. That offer letter says that he is going to be the HR manager at the Lexington plant and have some other duties at some other plants. And if you'll look at Penny Ross's personnel file, that's exactly the same wording that you're going to see in her personnel file as well, that she's the HR manager at the Lexington plant and that she had HR duties at other plants as well. It's really not until we get to this case and we're defending this case that we see this broadened. You don't see evidence of it in the record that he had a more broadened job description than Penny Ross had. Your Honors, the discriminatory atmosphere evidence that we presented and the other acts evidence that we presented was not considered by the district court. That evidence showed that women across the board were paid less. Mr. Parris terminated several of them. He demoted several of the women. Brave women came forward and testified this. And so when you look at what Mr. Parris thought of Ms. Ross and her capabilities, we would suggest that his thoughts about her had to do with her being a woman and that that was exactly what this gender discrimination case is about. If he didn't believe she was capable, he must not have believed that any of those women there were capable. And he admitted he hadn't hired a single woman in any kind of upper level position since he had been there. The scope of employment rule. This court had it right in the Johnson case. All the cases that the defendant cites are relying on the FLSA law. And that law is to be applied very narrowly. That law has no opposition clause. It only has a participation clause. And we're instructed by this court that Title VII and DHRA is different. It does have an opposition clause, and it's not to be applied as narrowly. I presented case law to this court that even if you have a contractual duty to oppose, if you oppose and then you're retaliated against for opposing, that's what Title VII is all about. So even if her job is to voice concerns about illegalities, if she does that as a part of her job and then she's fired for it, that is exactly what Title VII protects. Your Honors, in this case, we have clearly shown prima facie cases for discrimination, wage and termination, for retaliation, and also in our whistleblower claims. We've come back and we've rebutted every single one of the reasons that Tim Paris gave for firing Ms. Ross. Clearly rebutted each one of those. Then we have shown additional evidence, a lot of additional evidence, of discrimination against women at this plant that the court did not find to be relevant. But it can serve as circumstantial evidence. It does not have to coordinate with time and place and person. If there is a general atmosphere, and this is more than a general atmosphere, this is discrimination against women, other women at this plant. It has to be evidence showing a general pattern of gender discrimination, and that's exactly what this does. And it can go to motive and intent, and it was not considered at all by this court. So we've shown additional evidence in addition to rebutting the nondiscriminatory reason, and we agree that the Honest Belief Rule is not applicable, but for a different reason. It's not applicable because there was no reliance on any particularized facts, no investigation, nothing that this court requires. So respectfully, Your Honors, I would thank you for considering this appeal and believe that this summary judgment should be denied. Thank you, counsel. The case will be submitted.